UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 1-09-bk-07161-RNO |
| | : | CASE NO. 1-09-bk-07158-RNO |
| THREE ARROWS ENTERPRISES, INC. | : | |
| d/b/a BLACK TIE MOTOR CARS, | : | CHAPTER 11 |
|     Debtor | : | |
| | : | |
| AUTOHAUS ACQUISITION, INC., | : | |
| d/b/a VICTORY VOLKSWAGEN, | : | |
| d/b/a VICTORY MITSUBISHI, | : | |
| d/b/a VICTORY AUDI | : | |
|     Debtor | : | |
| | : | |
| SUSQUEHANNA BANK, | : | |
|     Movant | : | |
| | : | |
| vs. | : | |
| | : | |
| THREE ARROWS ENTERPRISES, INC. | : | |
| d/b/a BLACK TIE MOTOR CARS, | : | |
|     Respondent | : | |
| | : | |
| AUTOHAUS ACQUISITION, INC., | : | |
| d/b/a VICTORY VOLKSWAGEN, | : | |
| d/b/a VICTORY MITSUBISHI, | : | |
| d/b/a VICTORY AUDI | : | |
|     Respondent | : | |

**MOTION OF SUSQUEHANNA BANK FOR AN ORDER CONVERTING THE DEBTORS' CHAPTER 11 BANKRUPTCY CASES TO CASES UNDER <u>CHAPTER 7 OF THE BANKRUPTCY CODE</u>**

Susquehanna Bank ("Bank"), secured creditor in these Chapter 11 cases, by its undersigned counsel, submits this motion for an order converting these Chapter 11 cases of the debtors and debtors in possession, Three Arrows Enterprises, Inc. ("Three Arrows") and Autohaus Acquisition, Inc. ("Autohaus", and together with Three Arrows, collectively, the "Debtors" and each a "Debtor"), to cases under Chapter 7 of the Bankruptcy Code.

## PRELIMINARY STATEMENT

1. The Debtors freely admit that they lack the financial and management controls necessary to assure secured and unsecured creditors that the assets of the Debtors' estates are not being improperly dissipated. It is clear that their accounting and recordkeeping are in disarray, rendering them unable to properly account for their operations. The Debtors have failed to provide evidence that they have viable businesses and are succeeding only in depleting the limited assets available to satisfy creditors. Indeed, Autohaus has already filed a motion under Section 363 of Title 11, United States Code (Title 11, United States Code, as amended, herein the "Bankruptcy Code"), to sell substantially all of its Volkswagen dealership assets and will, as a result, most likely cease operations. Three Arrows at this time has only a limited vehicle inventory, insufficient to support continuing operations. In each case, there is neither a viable business to reorganize nor an advantage to liquidating under Chapter 11. To conserve whatever value may still remain in the assets of these estates, these cases should be converted to cases under Chapter 7.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is 11 U.S.C. § 1112(b). Bankruptcy Rules 1017 and 9014 govern a proceeding to convert a Chapter 11 case to a Chapter 7 case under Section 1112(b) of the Bankruptcy Code.

## BACKGROUND

3. Debtor Autohaus has been in the business of selling and servicing Volkswagen motor vehicles under a dealer sales and service agreement with Volkswagen of America, Inc., as well as selling and servicing used or pre-owned motor vehicles.

4. Debtor Three Arrows has been in the business of selling and servicing used or pre-owned motor vehicles manufactured by various companies.

5. On September 16, 2009, the Debtors each filed their voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result thereof, each Debtor has been appointed as a Debtor in possession and operates its business and manages its assets pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee has been appointed in either of these cases.

6. By Order entered October 5, 2009, the Bank and each of the Debtors entered into an Interim Stipulation authorizing the use of cash collateral in each of the Debtors' Chapter 11 cases (each of such Stipulations, Document Nos. 45 and 48 respectively in the Autohaus and Three Arrows cases, the "First Stipulation" and together the "First Stipulations") (a) placed limits upon the use of cash collateral by the Debtors, (b) required adherence to an expense budget, and (c) placed controls on the sale of automobile inventory, including payment to the Bank of "floor plan" loans associated with each vehicle sold.

7. By Order entered October 29, 2009, the Bank and each of the Debtors entered into a Second Interim Stipulation, which authorized the use of cash collateral in the Three Arrows case and prohibited cash collateral use in the Autohaus case (each of such Stipulations, Document Nos. 94 and 93 respectively in the Autohaus and Three Arrows cases, the "Second Stipulation" and together the "Second Stipulations"). The Three Arrows Second Stipulation (a) placed limits upon the use of cash collateral by the Debtor, (b) required adherence to an expense

budget, and (c) placed controls on the sale of automobile inventory, including payment to the Bank of floor plan loans associated with each vehicle sold.

8. It is a matter of public knowledge and public record that the new vehicle manufacturing and sales industry and the used vehicle sales industry in the United States have experienced substantial financial difficulty, particularly during the last year.

9. The downturn in the automobile industry has been part of a larger economic downturn which has elicited various responses from the United States Government intended to stimulate the broader economy and, specifically, to stimulate and reorganize the automotive industry. *See e.g.,* http://money.cnn.com/2009/10/21/autos/auto-bailout_rattner.fortune/index.htm. With respect to the automotive industry, one of those responses has been a program known as the Consumer Assistance to Recycle and Save (CARS) Program created by the Consumer Assistance to Recycle and Save Act of 2009 (Pub.L. No. 111-32), also known as "Cash for Clunkers", which provided monetary credits through automobile dealers to vehicle owners trading certain used vehicles for new vehicles. *See* 49 CFR Parts 512 and 599. However, the "Cash for Clunkers", or CARS Program, ended on August 25, 2009. *See* http://www.cars.gov/files/official-information/rule.pdf. The Debtors filed their bankruptcy petitions 22 days later.

10. At the hearing before the Court on the Debtors' Motions for authority to use cash collateral on October 7, 2009, the Bank provided testimony and evidence that, prior to the filing of the Debtors' cases, the Debtors were, in the aggregate, in an "out-of-trust" position with the Bank with respect to floor plan financing made available to the Debtors in an amount exceeding One Million Seven Hundred Thousand Dollars ($1,700,000.00), as a result of the Debtors having sold new and used vehicle inventory which had been floor plan financed by the Bank but having

failed to deliver proceeds from such sales to the Bank sufficient to repay the loan amount on each of the vehicles sold. Testimony by the Debtors at such hearing indicated that the Debtors were (a) in fact "out-of-trust" prior to the bankruptcy filings and (b) unable to explain how the "out-of-trust" situation occurred.

11. Also at the cash collateral hearing held before the Court on October 7, 2009, the representative of the Debtors freely admitted during his testimony that the accounting and financial records of the Debtors were in a shambles and did not permit them to answer fundamental financial questions about their business. Subsequent review of such records by an accountant hired by the Bank has confirmed this assessment.

12. Debtor Autohaus has filed its Motion pursuant to Section 363 of the Bankruptcy Code seeking approval to sell its Volkswagen assets free and clear of all liens, claims, encumbrances and other interests and has, in the interim, ceased operations. For this reason, the Second Stipulation pertaining to Autohaus prohibits further use of cash collateral.

13. As of November 6, 2009, Debtor Three Arrows is believed by the Bank to have in its possession no more than ten (10) used automobiles intended for resale and appears to be selling such remaining inventory at a rate which is insufficient to generate sufficient sales proceeds to both (i) retire floor plan indebtedness with respect to the vehicles sold and (ii) provide sufficient remaining cash collateral to support the budgeted expenses set forth in the Second Stipulation pertaining to Three Arrows. At an average gross profit (after payment of corresponding floor plan debt) of $3,000.00 per vehicle, such remaining inventory is likely to generate only $30,000.00 for the operations of Three Arrows.

14. Debtor Three Arrows' 30 day cash budget (October 23 to November 22) included as part of the Second Stipulation assumed that twenty (20) vehicles would be sold during the

2745134-1                                    5

Case 1:09-bk-07161-RNO    Doc 127    Filed 11/16/09    Entered 11/16/09 15:36:35    Desc
                          Main Document        Page 5 of 11

period and included expenses (including $10,000.00 of professional fees) totaling One Hundred Eleven Thousand Fifty-eight Dollars and Ninety-five Cents ($111,058.95).

15. Debtor Three Arrows obviously has no floor plan financing availability with the Bank and has not sought Court approval for any alternative financing pursuant to Section 364 of the Bankruptcy Code.

## **ELEMENTS OF CAUSE**

16. Cause exists for the conversion of the Debtors' cases to Chapter 7 cases, pursuant to Section 1112(b)(1) and Section 1112(b)(4) of the Bankruptcy Code, in that:

(a) The Debtor has engaged in the unauthorized use of cash collateral harmful to the Bank, by violating the terms of both of the First Stipulations and the Second Stipulation pertaining to Three Arrows, in that since the filing of the bankruptcy petitions on September 16, 2009, certain vehicles were sold and the proceeds of such sale were not utilized to reduce the floor plan loan sums associated with such vehicles, nor were the sums in question deposited to the cash collateral accounts maintained at the Bank in accordance with the First Stipulations and Second Stipulations. Such failure has resulted in an additional "out-of-trust" lost to the Bank, in direct violation of the First Stipulations and Second Stipulations, in the amount of $155,820.00.

(b) The Debtors, particularly Three Arrows, have grossly mismanaged their bankruptcy estates, in that the disarray in the Debtors' financial record keeping and disregard for customary accounting and management requirements (which have been observed and confirmed by accountants employed by the Bank who reviewed records of the Debtors since the filing of the bankruptcy cases) does not permit the Debtors to comply with the requirements imposed on a Chapter 11 debtor-in-possession, nor does it permit the Debtors to determine whether they can operate profitably.

(c) The Debtors have violated orders of the court approving the First Stipulations and the Second Stipulations, not only as noted above with respect to cash collateral usage, but also by failing to adhere to the budgetary expense limits set forth in such stipulations, by failing to report sales of vehicles timely to the Bank, by increasing the "out-of-trust" amount post-petition, and by failing to provide bank statements and related copies of fronts and backs of checks and deposits for the Sovereign Bank account for the 12 month period prior to the bankruptcy and failing to provide bank account statements for 2 additional operating accounts and related copies of fronts and backs of checks and deposits.

(d) The expenditure of funds to fund ongoing operations of the Debtors, including employee costs, marketing costs and professional fees, while the Debtors' estates are manifestly unable to obtain financing and to generate sufficient revenue to support such expenses, has caused a substantial and continuing loss to and diminution of the estates of the Debtors, in the absence of a reasonable likelihood of rehabilitation.

(e) While it is known that the Debtors are continuing their operations and utilizing bank accounts held at institutions other than the Bank, it has thus far proved impossible for the Bank to timely track - and for the Debtors to explain - vehicle sales, cash collateral usage and cash collateral on hand. While the First Stipulations and Second Stipulations required that cash collateral remaining after expenses be deposited in cash collateral accounts at the Bank, the last such deposit was made on October 19, 2009 and the current balance is $7,589.00.

(f) During the period from the inception of these cases to November 13, 2009, a 58 day or more than 8 week period, the Debtors collectively sold ten (10) used vehicles and no new vehicles, which is an insufficient pace to permit their continued operation.

(g) Debtor Three Arrows financed a 2007 Jeep Patriot with the Bank under the floor plan financing. The vehicle in question is no longer at the Three Arrows facility, the loan amount has not been paid to the Bank and the Debtor has been unable to explain the location and disposition of the vehicle.

## ARGUMENT

**A.  Section 1112(b) Requires Conversion Upon Substantial or Continuing Loss and Absence Of A Reasonable Likelihood of Rehabilitation**

17. Section 1112(b)(1) of the Bankruptcy Code provides:

> Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that established that the requested conversion or dismissal is not in the best interest of creditors and the estate, the court *shall* convert a case under this Chapter to a case under Chapter 7 or dismiss a case under this Chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (emphasis supplied). Thus where "cause" is shown, the Court shall convert a Chapter 11 case to a Chapter 7 case upon the request of a part in interest absent "unusual circumstances."

18. The 2005 amendments to Section 1112(b) reduced the bankruptcy courts' discretion to convert or dismiss a Chapter 11 case by changing "may" to "shall". If cause for conversion or dismissal exists, discretion is limited to those instances in which the court makes specific findings that unusual circumstances "establish that the requested conversion or dismissal is not in the best interest of the creditors and the estate". *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007) (involuntary Chapter 7 debtor could not convert its case to one under Chapter 11 because cause existed for conversion or dismissal of the proposed Chapter 11 case); *see also* **In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007)** (noting the statutory language change "from permissive to mandatory" and finding cause

existed to convert the debtor's cases where the estate was diminishing rapidly at the expense of creditors as extensive administrative costs from professional fees were accumulating while the case lingered in Chapter 11). Therefore, upon a showing of cause, the Court must convert the Debtors' Chapter 11 cases to Chapter 7 cases "absent unusual circumstances specifically identified by the court that establish that he requested conversion or dismissal is not in the best interest of creditors and the estate". 11 U.S.C. § 1112(b)(1)

19. Section 1112(b)(4) lists non-exclusive grounds for conversion, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation". 11 U.S.C. § 1112(b)(4)(A). *See In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) (cause existed to convert the Chapter 11 cases in part because of the debtor's negative post-petition cash flow and inability to pay current expenses*); In re 3868-70 White Plains Road, Inc.*, 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (cause existed to convert where the debtor's assets were fully collateralized and it had negative cash flow and an inability to pay current expenses).

20. The first prong of § 1112(b)(4)(A) requires a showing of a "substantial or continuing loss to or diminution of the estate". As noted in Collier, "If the estate has sustained a substantial loss following the commencement of the case, or the debtor is operating with a sustained negative cash flow after the commencement of the case, these facts are sufficient to justify a finding of 'substantial or continuing loss to ... the estate'". *See* 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy, ¶1112.04[5][a] at 1112-34 (15th ed. rev'd 2008).

21. The second prong of § 1112(b)(4)(A) requires an "absence of a reasonable likelihood of rehabilitation". As noted in Collier, "the standard under section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's

business prospects justify continuance of the reorganization effort". *See* Collier, ¶1112.04[5][a] at 1112-36 (15th ed. rev'd 2008). *See also Quarles v. United States Trustee*, 194 B.R. 94, 97 (W.D. Va. 1996) (no likelihood of rehabilitation where debtor was losing money and only hope of reorganization depended on speculative outcomes in pending litigation); *In re Great Am. Pyramid J.V.*, 144 B.R. 780, 792 (Bankr. W.D. Tenn. 1992) ("A reorganization plan under Chapter 11 must be more than a nebulous speculative venture and must have a realistic chance of success which would lead to rehabilitation, and if outside financing is needed, it must be clearly in sight".) (emphasis in original); *In re Imperial Heights Apartments, Ltd.*, 18 B.R. 858, 863-864 (Bankr. S.D. Ohio 1982) (no "reasonable likelihood of rehabilitation" where debtor's only asset was a potential lawsuit).

22. "Rehabilitation" as used in section 1112(b)(4)(A) is not synonymous with "reorganization". Instead, "Rehabilitation signifies that the debtor will be reestablished on a sound financial basis, which implies establishing a cash flow from which current obligations can be met". *In re Rundlett*, 136 B.R. 376, 380 (Bankr. S.D.N.Y. 1992) (granting creditors' motion to convert Chapter 11 case to Chapter 7 where debtor's use of estate property resulted in continuing loss or diminution of the estate, there was not a reasonable likelihood of rehabilitation and the debtor would be unable to effectuate a plan) (citing *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988)) (affirming conversion of Chapter 11 case to Chapter 7 upon creditors' showing continuing diminution to the estate and absence of reasonable likelihood of rehabilitation).

23. A debtor "should not continue in control of its business beyond a point at which reorganization no longer remains realistic," if creditor recoveries are eroding. *In re AdBrite Corp.*, 290 B.R. at 215; *In re Johnston*, 149 B.R. 158, 161 (B.A.P. 9th Cir. 1992) (granting motion to convert debtor's Chapter 11 case to Chapter 7 where the debtor lacked the ability to

Case 1:09-bk-07161-RNO   Doc 127   Filed 11/16/09   Entered 11/16/09 15:36:35   Desc
Main Document      Page 10 of 11

effectuate plan of reorganization because it had no income and further delay would prejudice creditors by eroding their position).

24. The Debtors have demonstrated that they lack the ability to maintain adequate financial control of their business, which is sufficient reason to convert these cases. In addition, the sale of roughly one (1) used vehicle per week (on average) is insufficient to sustain any reorganization or rehabilitation of these Debtors.

## CONCLUSION

For the reasons set forth above, the Bank requests that the Court enter an Order in the form annexed hereto as Exhibit A converting these Chapter 11 cases to Chapter 7 cases, and granting such other and further relief as is just and proper.

BARLEY SNYDER LLC

Dated: November 16, 2009     By:     */s/ Timothy G. Dietrich*
Timothy G. Dietrich, Esquire
Court I.D. No. 37853
Attorneys for Susquehanna Bank
50 North Fifth Street, 2nd Floor
P.O. Box 942
Reading, PA 19603-0942

2745134-1     11

Case 1:09-bk-07161-RNO    Doc 127    Filed 11/16/09    Entered 11/16/09 15:36:35    Desc
Main Document    Page 11 of 11